UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

GREGORY A. JONES,

    Plaintiff,

        v.                                        CAUSE NO. 3:24-CV-231-TLS

NANCY MARTHAKIS,

    Defendant.

## OPINION AND ORDER

Gregory A. Jones, a prisoner without a lawyer, is proceeding in this case "against Dr. Nancy Marthakis in her individual capacity for money damages for denying him adequate medical care for a painful skin condition and prescribing him a medication that caused liver damage in violation of the Eighth Amendment[.]" ECF 11 at 3. Dr. Marthakis filed a motion for summary judgment. ECF 31. Jones filed a response, and Dr. Marthakis filed a reply. ECF 36, 37, 38. Dr. Marthakis' summary judgment motion is now fully briefed and ripe for ruling.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358

(7th Cir. 2010). However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009).

Under the Eighth Amendment, inmates are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697–98. Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Where the defendant has provided some level of care for a prisoner's medical condition, in order to establish

deliberate indifference the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

Dr. Marthakis provides Jones' medical records and her own affidavit, which show the following facts: Throughout his entire incarceration in the Indiana Department of Correction, Jones has had a diagnosis for plaque psoriasis. ECF 31-1 at 3. Plaque psoriasis is a chronic autoimmune disease that causes skin cells to reproduce very fast, resulting in thick, scaly patches on the skin called psoriasis. *Id.* There is no cure for plaque psoriasis, and the condition will have flare-ups and can be in remission at times. *Id.* There are a variety of medications that can be used to control the symptoms of plaque psoriasis, including coal tar shampoo, corticosteroids, injectable medications, oral medications, and topical creams. *Id.* The medications that treat plaque psoriasis can be hard on the patient's liver, so regular lab work is necessary to monitor liver functioning. *Id.* Liver enzymes (AST and ALT) tell doctors how a patient's liver is functioning. *Id.* The liver detoxifies most medication from the body, so when the liver is taxed by a medication, the proper treatment is to withhold that medication to allow the liver time to recover. *Id.*

Jones was enrolled in Indiana State Prison's (ISP) Chronic Care Clinic program for his plaque psoriasis, meaning he had regularly scheduled appointments with medical staff to manage his condition. ECF 31-1 at 2–3. The Chronic Care Clinic program allows medical staff to regularly monitor the patient's chronic condition, order any needed lab work, and renew and prescribe medications for that condition. *Id.* Jones was primarily treated at ISP by nurse

practitioners rather than by Dr. Marthakis. *Id.* at 2. Dr. Marthakis does not supervise or oversee the nurse practitioners, as they practice as independent medical providers and make their own independent decisions on patient care based on their medical judgment. *Id.* Dr. Marthakis is available when the nurse practitioners need input regarding a patient. *Id.*

On January 18, 2022, Jones saw Nurse Practitioner (NP) Diane Thews in the Chronic Care Clinic and she continued him on Methotrexate, folic acid, and a topic steroid cream for his plaque psoriasis. ECF 31-1 at 3; ECF 31-2 at 3–6. Methotrexate is an immunosuppressant that treats a variety of autoimmune disorders and was administered to Jones via weekly injections. *Id.*

On March 8, 2022, Jones saw NP Thews again in the Chronic Care Clinic and she continued him on Methotrexate and folic acid and ordered lab work. ECF 31-1 at 4; ECF 31-2 at 15–18.

On March 23, 2022, Jones saw NP Todd Wolford, who noted Jones had little success from the Methotrexate treatment and had psoriasis on his upper and lower extremities, torso, and back. ECF 31-1 at 4; ECF 31-2 at 21–23. NP Wolford substituted Jones' Methotrexate prescription for an injectable medication called Humira and added Minerin crème for moisture. *Id.* Humira was not available at the pharmacy at that time so Jones continued to receive Methotrexate until Humira was available. *Id.*

On April 15, 2022, nursing staff notified Dr. Marthakis that Humira still was not available from the pharmacy, so Dr. Marthakis gave a verbal order to the nurse to give Jones his weekly injection of Methotrexate. ECF 31-1 at 4; ECF 31-2 at 34–35. Dr. Marthakis then scheduled a meeting with NP Wolford to discuss Jones' medication needs given that Humira still was not available. *Id.* Because Jones' Methotrexate prescription had not helped him much and

Humira still was not available, Dr. Marthakis and NP Wolford decided to try Jones on Cimzia, an anti-inflammatory drug used to treat a variety of inflammatory conditions. *Id.*

On June 8, 2022, Jones saw NP Wolford in the Chronic Care Clinic. ECF 31-1 at 4; ECF 31-2 at 38–41. NP Wolford noted that Jones' psoriasis was much improved. *Id.* He reviewed Jones' recent lab work, ordered new labs, and continued Jones on Cimzia. *Id.* The lab work ordered by NP Wolford showed that Jones had normal liver enzymes. *Id.*

On December 8, 2022, Jones saw NP Kimberly Pflughaupt for his Chronic Care Clinic exam. ECF 31-1 at 4–5; ECF 31-2 at 62–65. Jones reported his plaque psoriasis symptoms had been fairly well controlled until his medication recently became unavailable, as his Cimzia prescription had expired in October 2022. *Id.* NP Pflughaupt ordered Humira and Minerin crème for Jones' plaque psoriasis. *Id.* Jones was scheduled to receive an 80 mg injection of Humira on Day 1, and then to receive 40 mg injections every 2 weeks beginning on Day 8. ECF 31-2 at 64.

On December 12, 2022, NP Karen Fagan saw Jones to discuss his plaque psoriasis. ECF 31-1 at 5; ECF 31-2 at 66–68. She noted he would only be on Humira short term until a newer medication, Avsola, could be started. *Id.*

On February 21, 2023, NP Fagan met with Jones to discuss starting the new medication Avsola. ECF 31-1 at 5; ECF 31-2 at 78–80. She noted his recent lab work showed elevated liver enzymes, including an AST of 496 and an ALT of 200, so she decided to hold off on the Avsola for one month to re-evaluate his liver enzymes with additional blood work. *Id.* At that point, Jones had an active prescription for Minerin crème but no longer was prescribed any injectable medications. ECF 31-2 at 80.

On February 23, 2023, Dr. Marthakis saw Jones for a Chronic Care Clinic visit. ECF 31-1 at 5; ECF 31-2 at 81–83. Dr. Marthakis renewed Jones' prescription for Minerin crème and

5

concluded he was not ready to be prescribed any injectable medications because his recent lab work showed elevated liver enzymes. *Id.* She noted she was awaiting further lab results of his liver functioning, including Hepatitis testing. *Id.* Jones began receiving a topical steroid ointment called triamcinolone. ECF 31-2 at 83.

On March 2, 2023, Jones' lab work showed his Hepatitis testing was negative and his AST was back within normal limits. ECF 31-1 at 5. His ALT was just beyond the normal range at 61, whereas it had been at 200 during his prior visit. *Id.* The normal ALT range is 7 to 56. *Id.* Withholding Jones' injectable medications worked to bring his liver enzymes back to the normal range. *Id.*

On March 9, 2023, NP Pflughaupt examined Jones to discuss his lab work. ECF 31-1 at 5–6; ECF 31-2 at 88–90. Jones had no symptoms of any liver problems such as belly pain, nausea, vomiting, or jaundice. *Id.* He had significant psoriatic rash to his trunk and extremities, but his lab work had improved. *Id.* They discussed starting Avsola, but Jones was unsure about it. *Id.* He reported he had seen a dermatologist prior to his incarceration and NP Pflughaupt noted medical staff would request those records. *Id.*

On April 19, 2023, Dr. Marthakis examined Jones in the Chronic Care Clinic. ECF 31-1 at 6; ECF 31-2 at 95–98. He reported his topical steroid cream was of limited help and he still had a rash on his arms, legs, and back. *Id.* Dr. Marthakis decided to "switch up" his topical steroid cream, and Jones began receiving betamethasone topical cream in addition to the triamcinolone topical ointment. *Id.* They discussed his Hepatitis testing and that his liver enzymes were still mildly elevated, so Dr. Marthakis was hesitant to put him back on an injectable medication for the plaque psoriasis. *Id.* She ordered an abdominal ultrasound to further evaluate his liver. *Id.* The ultrasound was performed on May 1, 2023, and showed fatty

6

infiltration of the liver but was otherwise normal and showed no sign of liver damage. *Id.* Fatty liver is not liver damage and can be caused by a variety of things, including high cholesterol and obesity. *Id.* Jones had several present risk factors for fatty liver disease including obesity, diabetes, and hypertension. *Id.*

On June 16, 2023, Jones saw NP Pflughaupt to discuss his liver ultrasound results. ECF 31-1 at 6; ECF 31-2 at 109–11. NP Pflughaupt noted that medical staff had received Jones' past records from his dermatologist, which showed he was treated with phototherapy prior to his incarceration. *Id.* She noted she would obtain a "Rubicon" consultation, which is a program where medical staff can input information about a patient and obtain a consultation from a specialist, such as a dermatologist. *Id.* NP Pflughaupt also noted she discussed Jones' fatty liver with him and that she recommended dietary changes and increased exercise. *Id.*

On August 14, 2023, Jones saw NP Pflughaupt and reported his prescribed topical cream was not helping. ECF 31-1 at 7; ECF 31-2 at 115–17. NP Pflughaupt noted she had obtained a dermatology consultation through Rubicon and discussed the recommendation with him, which was to do a steroid taper with oral steroids and order a high potency steroid ointment. *Id.* If that did not improve things in 6 weeks, they would try the Avsola treatment. *Id.* Jones agreed to that plan and received a prescription for prednisone. *Id.*

On October 5, 2023, Dr. Marthakis examined Jones in the Chronic Care Clinic. ECF 31-1 at 7; ECF 31-2 at 118–20. Dr. Marthakis noted that Jones reported the steroids alone had not helped with the rash on his arms, knees, and abdomen, and he could not tolerate Methotrexate because it previously had elevated his liver enzymes, so she entered an order for the Avsola, which would be administered through IV infusions. *Id.* Beginning as early as October 9, 2023,

Jones had an active prescription for Avsola. ECF 31-2 at 121. On November 21, 2023, Jones' lab work showed his liver enzymes were within the normal range. ECF 31-1 at 7.

On January 9, 2024, Jones submitted a Healthcare Request Form (HCRF) expressing concern he was not getting any medical treatment for his fatty liver. ECF 31-1 at 7; ECF 31-3 at 32. Dr. Marthakis attests there is no treatment for fatty liver other than to treat what may be causing it, and Jones' fatty liver was caused by his excessive weight, as he was 5'5" tall and weighed 270 pounds. ECF 31-1 at 7.[1] Dr. Marthakis notes that despite NP Pflughaupt's recommendation to improve his diet and exercise, Jones' weight climbed from 244 pounds in April 2023 to 270 pounds in January 2024. *Id.*

On January 23, 2024, Jones did not show up for his scheduled Chronic Care Clinic exam. ECF 31-1 at 8; ECF 31-2 at 133–34. On January 30, 2024, Nurse Thews examined Jones and he complained of occasional pain on the right side of his upper abdomen but denied chest pain, shortness of breath, nausea, vomiting, fever, diarrhea, constipation, and burning with urination. ECF 31-1 at 8; ECF 31-2 at 135–37. NP Thews ordered more lab work to check his liver. *Id.*

On February 9, 2024, Jones' lab work showed a normal AST level and a mildly elevated ALT level. ECF 31-1 at 8. On February 10, 2024, Jones' amylase (an enzyme that breaks down complex carbohydrates) was normal. *Id.*

At that point, Jones became noncompliant with his treatment. ECF 31-1 at 8. On March 29, 2024, he had an appointment to see nursing staff to have his medications renewed, but he left the medical services area without speaking to anyone. *Id.*; ECF 31-2 at 141. On April 2, 2024, he refused to pick up his medication for his psoriasis, hypertension, and diabetes. ECF 31-1 at 8; ECF 31-2 at 143. He then submitted a HCRF stating he was refusing his medication because he

---

[1] This body-mass index is considered "extreme obesity" by the National Institutes of Health. *See* https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited January 30, 2026).

8

believed he had a liver problem and wanted a liver biopsy. ECF 31-1 at 8; ECF 31-3 at 35. He submitted another HCRF asking for generic medications to treat his psoriasis and listed various medications that were advertised on television. ECF 31-1 at 8; ECF 31-3 at 36.

On April 11, 2024, Jones was seen in the Chronic Care Clinic by NP Marne Juestel-Ochs. ECF 31-1 at 8; ECF 31-2 at 149–50; ECF 31-3 at 1–4. He had a flare of psoriasis on his trunk and was 5'5" tall and weighed 270 pounds. *Id.* NP Juestel-Ochs ordered Yusimry (an injectable medication used to treat pain, inflammation, and skin conditions caused by autoimmune disorders) for his psoriasis and told Jones to take prednisone until the Yusimry came in. *Id.* She also ordered labs. *Id.*

On May 2, 2024, Jones had an appointment with Dr. Marthakis. ECF 31-1 at 9; ECF 31-3 at 9–11. He reported he had no new issues that needed to be addressed and did not need to be seen, as the NP already had addressed his medication and liver issue. *Id.* Jones appeared to have been satisfied with the Yusimry. *Id.* Because Jones concedes these facts "are not in dispute," the court accepts them as undisputed. *See* ECF 36-1 at 2.

Dr. Marthakis argues summary judgment is warranted in her favor because she provided Jones with constitutionally adequate medical care for his plaque psoriasis and liver issues. ECF 33 at 6–8. She attests it was reasonable, appropriate, and within the standard of care to treat Jones' plaque psoriasis with Methotrexate and then to switch to alternative medications once his liver enzymes became elevated, and it was also appropriate to withhold Jones' medication until his liver enzymes returned to normal levels. ECF 31-1 at 9. Moreover, she attests Jones' liver enzymes were routinely monitored with regular lab work to check his enzyme levels and liver functioning, as elevated liver enzymes are a common risk factor with Methotrexate treatment,

and his Methotrexate was stopped for an alternative medication as soon as it was determined that it was not effectively managing his plaque psoriasis and causing elevated liver enzymes. *Id.*

Here, it is undisputed Dr. Marthakis and the NPs provided treatment for Jones' plaque psoriasis by: (1) prescribing him topical steroid creams, Minerin crème, oral steroids, and injectable medications such as Methotrexate; (2) regularly monitoring his condition by examining him, drawing his labs, monitoring his liver enzymes, performing an ultrasound on his liver, and performing Hepatitis testing; (3) obtaining a Rubicon consultation and following the dermatologist's recommendation to perform a steroid taper; (4) "switching up" his topical steroid cream prescription when he reported it was ineffective; and (5) replacing his Methotrexate prescription with various alternative medications including Cimzia, Humira, Avsola, and Yusimry once it was determined the Methotrexate was ineffective and was elevating his liver enzymes. To survive summary judgment, Jones must provide evidence this treatment provided by Dr. Marthakis was "plainly inappropriate." *See Hayes*, 546 F.3d at 524. Jones raises several arguments in this regard.

First, Jones argues it was inappropriate to initially prescribe him Methotrexate, as that medication should only be used where all other medications have been ineffective. ECF 36-1 at 3. But Jones provides no evidence supporting this argument, and his belief that Dr. Marthakis should have tried other medications before prescribing Methotrexate amounts to a mere disagreement with a medical professional, which is insufficient to show an Eighth Amendment violation. *See Ciarpaglini*, 352 F.3d at 331*; Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021) (explaining that a plaintiff cannot establish an Eighth Amendment violation merely by alleging he "believes the treatment was ineffective or disagrees with the doctor's chosen course of treatment."). There is no evidence in the record by which a reasonable jury could conclude it

10

was "plainly inappropriate" or violated any standard of care for Dr. Marthakis to initially prescribe Methotrexate to treat Jones' plaque psoriasis.

Second, Jones argues Dr. Marthakis acted inappropriately by keeping him on Methotrexate once she knew it was not helping and was causing liver damage. ECF 36-1 at 3. Persisting in treatment known to be ineffective can constitute deliberate indifference. *See Thomas*, 991 F.3d at 772 ("Persisting in treatment known to be ineffective can constitute deliberate indifference, provided that the doctor was subjectively aware that the treatment plan was ineffective."). However, the record belies Jones' argument that Dr. Marthakis kept him on Methotrexate once she knew it was ineffective. The undisputed facts show that once Jones' Methotrexate was shown to be ineffective, NP Wolford discontinued his Methotrexate prescription and prescribed him Humira. *See* ECF 31-2 at 21–23. And when it turned out Humira was unavailable at the pharmacy, Dr. Marthakis met with NP Wolford and determined to try Jones on Cimzia instead. *Id.* at 34–35. Moreover, it is undisputed Dr. Marthakis regularly monitored Jones' liver enzymes and, once his lab work showed his enzyme levels were elevated, she withheld his injectable medications until his liver enzymes dropped to a normal range and then prescribed him a new medication, Avsola. ECF 31-1 at 5; ECF 31-2 at 81–83, 95–98, 118–20. Dr. Marthakis also "switched up" Jones' topical steroid cream prescription once he complained it was of limited help. ECF 31-1 at 6; ECF 31-2 at 95–98. Accordingly, the undisputed facts show Dr. Marthakis never persisted in a course of treatment she knew to be ineffective, but rather regularly changed Jones' prescriptions based on the results until she found a treatment plan that worked for him.

Third, Jones argues Dr. Marthakis' treatment was inappropriate because she did not provide treatment for his fatty liver. ECF 36-1 at 3. Here, it is undisputed that NP Pflughaupt

11

instructed Jones to treat his fatty liver by changing his diet and increasing his exercise to lose weight, but that Jones then gained approximately 25 pounds. ECF 31-2 at 109–11; ECF 31-1 at 7; *see Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005) (explaining that an inmate cannot be permitted to "engineer" a constitutional violation). Dr. Marthakis attests there is no treatment for fatty liver other than to treat what may be causing it, and that Jones' fatty liver was caused by his excessive weight. ECF 31-1 at 7. Jones argues his diet was "controlled by medical" and his psoriasis made it difficult for him to exercise, ECF 36-1 at 3, but this vague assertion is insufficient to create a genuine dispute. It is undisputed Jones was 5'5" tall and weighed 270 pounds, and his vague assertion that his diet was "controlled by medical" does not explain why he was unable to lose any weight. *See Gabrielle M. v. Park Forest-Chi. Heights Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003) ("It is well established that in order to withstand summary judgment, the non-movant must allege specific facts creating a genuine issue for trial and may not rely on vague, conclusory allegations"); *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017) ("Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough." (cleaned up)). Moreover, there is no evidence in the record that there were any other treatment options Dr. Marthakis could have pursued to treat Jones' fatty liver, as Jones provides no evidence disputing Dr. Marthakis' attestation that the only available treatment was for Jones to lose weight. Based on the evidence in the record, no reasonable jury could conclude it was "plainly inappropriate" or violated any standard of care for Dr. Marthakis to treat Jones' fatty liver by instructing him to lose weight.

Lastly, Jones argues that Dr. Marthakis' treatment was plainly inappropriate because she left him without any treatment on several occasions. ECF 36-1 at 3–4. Specifically, Jones argues that once his Methotrexate was discontinued in March 2022, he was left untreated "without

medical reason" until May 20, 2022. ECF 36-1 at 3–4. As discussed above, it is undisputed NP Wolford discontinued Jones' Methotrexate treatment in March 2022 because it was ineffective and prescribed him Humira, but Humira was not available at the pharmacy. *See* ECF 31-2 at 21–23. Dr. Marthakis was informed Humira was not available, so she gave a verbal order for the nurse to provide Jones with Methotrexate and then scheduled a meeting with NP Wolford and decided to provide Jones with Cimzia because the Humira was not available. *See id.* at 34–35. No reasonable jury could conclude Dr. Marthakis' handling of this situation was "plainly inappropriate."

Jones also argues he was left untreated between September 26, 2022, and December 12, 2022. ECF 36-1 at 4. The record shows Jones met with NP Wolford on June 8, 2022, and NP Wolford noted Jones' Cimzia prescription was working well at treating his psoriasis. ECF 31-2 at 38–41. Jones next met with NP Pflughaupt on December 8, 2022, and it was noted his Cimzia prescription had expired in October 2022. *Id.* at 62–65. Here, even accepting as true that it was inappropriate to let Jones' Cimzia prescription expire in October 2022 and not to provide him with any injectable medications during this time period, there is no evidence Dr. Marthakis was in any way involved in this conduct. *See Kuhn v. Goodlow*, 678 F.3d 552, 555-56 (7th Cir. 2012) ("§ 1983 liability is premised on the wrongdoer's personal responsibility"); *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001) ("Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable. The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see."). The undisputed facts show it was NP Wolford and NP Pflughaupt, not Dr. Marthakis, who treated Jones during this time period, and Jones provides no evidence that Dr. Marthakis examined him, denied him medication, received any kind of request from him, or issued any

13

instructions or medical orders related to his treatment during this time period. Therefore, no reasonable jury could conclude Dr. Marthakis was personally responsible for not providing Jones any injectable medications between September 26, 2022, and December 12, 2022.

Accordingly, Dr. Marthakis has provided undisputed evidence she treated Jones' plaque psoriasis by routinely monitoring his condition with lab work to check his liver functioning and prescribing various topical steroid creams and injectable medications until she discovered a treatment regimen that worked for Jones. Dr. Marthakis attests the treatment Jones received was reasonable, appropriate, and within the standard of care, and Jones in his response has not provided any evidence by which a reasonable jury could conclude the treatment provided by Dr. Marthakis was "plainly inappropriate" or violated any standard of care. Therefore, because the undisputed facts show Dr. Marthakis provided constitutionally adequate care for Jones' plaque psoriasis and liver issues, summary judgment is warranted in favor of Dr. Marthakis.

For these reasons, the court:

(1) GRANTS Dr. Marthakis' motion for summary judgment (ECF 31); and

(2) DIRECTS the clerk to ENTER FINAL JUDGMENT stating:

Final judgment is entered in favor of the Defendant Nancy Marthakis and against the Plaintiff Gregory A. Jones, who takes nothing by his Complaint.

SO ORDERED on February 26, 2026.

                                                  s/ Theresa L. Springmann  
                                                  JUDGE THERESA L. SPRINGMANN  
                                                  UNITED STATES DISTRICT COURT